J-A25003-17

2017 PA Super 364

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MIGUEL ANGEL RODRIGUEZ | : | |
| | : | No. 210 EDA 2017 |
| Appellant | | |

Appeal from the Judgment of Sentence February 12, 2016
In the Court of Common Pleas of Northampton County Criminal Division
at No(s): CP-48-CR-0003835-2014

BEFORE: OTT, STABILE, JJ., and STEVENS, P.J.E.*

OPINION BY STEVENS, P.J.E.: **FILED NOVEMBER 15, 2017**

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Northampton County following Appellant's conviction by a jury on the charge of first degree murder, 18 Pa.C.S.A. § 2502(a). After a careful review, we affirm.

The trial court has extensively set forth the factual and procedural history underlying this appeal as follows:

> [Following a Grand Jury investigation, Appellant was arrested and charged with Criminal Homicide.] The Commonwealth provided discovery[,] and defense counsel filed [an] omnibus pretrial motion on April 28, 2015, seeking additional discovery and suppression of [Appellant's] statements to the police. A suppression hearing was held on June 11, 2015, to address a number of issues raised by [Appellant] in his omnibus pretrial motions.
>
> ***

_____
* Former Justice specially assigned to the Superior Court.

Following the pretrial hearing, both parties submitted briefs to the court. On September 10, 2015, the court denied [Appellant's] motions to suppress statements he made to the police and his motion to reveal the identify [of the Commonwealth's confidential informant]. On the same day, the Commonwealth issued subpoenas to twenty-seven witnesses whose addresses and phone numbers were not disclosed [in order] to ensure their safety. Defense counsel was given an opportunity to meet with these witnesses at the Courthouse.

The [jury] trial in this case[, at which Appellant was represented by counsel,] began on February 1, 2016[,] and ended on February 5, 2016. The jury returned a verdict of guilty to one count of Criminal Homicide-First Degree Murder....The following evidence was presented at trial in support of this verdict.

On February 9, 2013, Easton Police responded to a report of shots fired at Eddie G's bar in Easton. [N.T., 2/2/16, at 8-9.] Officer Brian Burd of the Easton Police Department was the first officer on the scene. [*Id.* at 9.] Officer Burd was directed to the "Employee's Only" area of the bar, where he observed the victim, Damien Robinson, lying on the floor. [*Id.* at 10.] At the time of the officer's arrival, the victim was still alive, but he was unconscious and his breathing was shallow. [*Id.* at 12.] Jennifer Delgado, an employee at Eddie G's and a witness, was administering CPR to the victim. [*Id.* at 10-11.] Officer Burd directed her to stop CPR so that he could check the victim's vital signs and administer life saving measure[s]. *Id.* Officer Burd then radioed for backup[,] EMS[,] and Fire. [*Id.* at 12.] While treating the victim, Officer Burd observed a gunshot wound to the victim's left upper chest area and a gunshot [wound] at his right armpit. [*Id.* at 14.]

Once backup officers, [F]ire[,] and EMS arrived, they managed to secure the scene and began looking for a gun. [*Id.* at 16.] The victim was removed from the scene and taken to the hospital. [*Id.* at 16-17.] Officer Burd then began interviewing witnesses, including Ms. Delgado, Darryl Williams, Rico Garnet, and Mike King. [*Id.*] Of those witnesses, only Mr. King saw the shooting and could provide a description of the shooter. [*Id.* at 17.] Mr. King worked as a bouncer at Eddie G's. *Id.* He described the shooter as a five feet, eight inch[] tall black male with medium-toned skin. [*Id.* at 18.] The shooter was wearing a dark hoodie with the hood up and dark sweatpants. *Id.* He described the gun as a black semi-automatic handgun. *Id.*

Officer Burd [] observed a shell casing outside the "Employee's Only" door leading [to] the back room where the victim was found. [*Id.*] On the left side (if entering through the "Employee's Only" door) of the room, officers observed a cartridge casing with an unfired round, an empty shell casing, and a bag of what was suspected to be marijuana. [*Id.*] In the same room was another closed door with a bullet hole through it. [*Id.* at 18-19.] Officers found two bullets inside the room behind the door. *Id.* Officers further observed a broken cell phone and a sweatshirt near the rear door of the building. [*Id.* at 19.]

Next, Dr. Zhongxue Hua testified as an expert in forensic pathology. [*Id.* at 57-58.] Dr. Hua reported the findings of his autopsy to the jury. This included the discovery of two gunshot[] wounds on the victim, one of which was fatal, and their trajectory through the body. [*Id.* at 65-67.] Dr. Hua opined that the cause of death was a gunshot wound to the chest with no contributing factors. [*Id.* at 92.] During this testimony, two colored pictures of the injuries were presented to the jury, one of the victim's chest wound and one of the victim's back where exit wounds were observable. [*Id.* at 52.] These photographs were entered into evidence over the objections of [Appellant]. [*Id.* at 51.] The pictures were displayed for approximately a minute while in use by Dr. Hua to describe the location of entry and exit wounds on the victim. [*Id.* at 63-64.] An instruction was given to the jury by the court prior to the introduction of the photographs, explaining their purpose and instructing the jury to not allow their emotions to prejudice [Appellant]. [*Id.* at 61-62.]

Detective Darren Snyder was responsible for processing the crime scene at Eddie G's bar. Along with evidence observed by Officer Burd, Detective Snyder also collected another 9mm Luger casing, an orange lighter, and bullet fragments. [*Id.* at 114, 141-42.] Detective Snyder also collected DNA samples from a blood smear on a closet door, the push bar of the "Employee's Only" door, the rear exit door, and from the cell phone discovered by Officer Burd. [*Id.* at 125-26, 128, 132, 181.]

Corporal Jeffery Dietz of the Pennsylvania State Police Regional Crime Lab testified at trial as an expert in firearm and tool mark examination. [*Id.* at 254.] He asserted that all three cartridge casings recovered from the scene were fired from the same firearm. [*Id.* at 261.] He also compared the two intact bullets and the fragments found at the scene and discovered that all three items were fired from the same gun. [*Id.* at 264-66.]

Detective Matthew Rush, the affiant in the present case, testified regarding his investigation at trial. Specifically, Detective Rush spoke about his conversations with [Appellant] at the Easton Police Department. At an interview on February 21, 2013, [Appellant] stated that he had arrived at Eddie G's on the night of the incident around 9:00 pm and had not witnessed the gunshots. (Commonwealth Ex. 76). He also denied ever being in the back room of the bar. [*Id.*] [Appellant] also denied losing his phone at Eddie G's and insisted it was at his house, but later in the interview said that a man named Devol James borrowed his phone and lost it. [*Id.*]

On March 11, [2013,] Detective Rush obtained a search warrant for [Appellant's] DNA to be compared with the evidence at the scene. [N.T., 2/4/16, at 42-45.] The DNA sample was collected from [Appellant] at which time [Appellant] told Detective Rush he had gone to New York for a few days before coming back to Easton. [*Id.* at 46.] The two spoke again on April 29, 2013[,] and [Appellant] denied having anything to do with the homicide. [*Id.* at 47-48.] [Appellant] testified before the Grand Jury on June 27, 2013. In his testimony, [Appellant] stated that he has two cell phones and sometimes gives one of them to a man identified as "Hood" for drug transactions. [*Id.* at 58.]....[Appellant admitted that on the night in question he was] at Eddie G's wearing a grey sweat suit. [*Id.* at 61, 69.] He claimed that Hood had told him that he lost the cell phone [that Appellant] gave him at Eddie G's. [*Id.* at 89.] He testified that he stayed at the Ramada Inn briefly after the shooting and then went to New York around February 12, 2013[,] for a few days. [*Id.* at 100-02.] [Appellant] denied having a gun that night. [*Id.* at 91.]

The Commonwealth also called Catherine Palla, who was qualified as an expert in DNA profiling. [*Id.* at 166-67.] She tested the known samples from [Appellant] with the various collected samples found at the crime scene. [*Id.* at 174.] The bag of marijuana found at the scene had DNA from two people, one of which was [Appellant]. [*Id.* at 175.] None of the casings had enough DNA to test. [*Id.* at 176.] The cell phone contained a mixture of three different DNA profiles, with a major contributor of the mixture being [Appellant]. [*Id.*]

The Commonwealth called a number of eyewitnesses, the two most significant of which was Jennifer Delgado and Mike King.

Mike King worked as a bounced [*sic*] at Eddie G's on the night of the shooting. He testified that he recalled seeing

[Appellant] and Hood at Eddie G's on the night in question. [N.T., 2/3/16, at 7-10.] He saw [Appellant] and Hood arguing with a man known as "La[l]a," who was at the bar with the victim, known as "Head." [*Id.* at 11-12.] Mr. King was required to break up the argument between the two groups. [*Id.* at 15.] Mr. King was called to break up a fight in the back later that night, which was taking place on the other side of the "Employee's Only" door. [*Id.* at 19-20.] When he entered the back area through the door, he saw [Appellant] pulling a gun up in his right hand. [*Id.* at 20-21.] He heard three gunshots. [*Id.* at 17-24.] He then went into the back room and observed the victim, leaning against the closet door trying to breathe. [*Id.* at 26.] He then ran back to the bar and called an ambulance. [*Id.* at 27.] When speaking to the police that night, Mr. King did not identify [Appellant] because he says [that] he was scared of retaliation and did not want [Appellant] to be arrested. [*Id.* at 30.] Mr. King testified twice in front of the Grand Jury, the first time he did not identify [Appellant]. The second time, his testimony changed and he identified [Appellant] as the shooter. [*Id.* at 42]. Mr. King state[d] the reason his testimony changed is because his girlfriend became pregnant with twins and he did not want to risk going to jail. [*Id.*]

Jennifer Delgado was a bartender at Eddie G's that night. At the time of the shooting, Ms. Delgado was "hooking up" with a friend of [Appellant,] known as "City," whom she had known for about a year. [*Id.* at 123-24.] She was behind the bar when she heard two or three gunshots that night. [*Id.* at 136-37.] While the police were on the scene, Ms. Delgado was contacted by City and ordered to sneak out of the bar. [*Id.* at 144.] She then went to the Ramada Inn where she met up with City, Hood, and [Appellant], as well as three other men. [*Id.* at 146-47.] The next day, before going to speak to the police who were looking for her, she went with City to look for the gun down by Eddie G's. [*Id.* at 151.] After being instructed by City on what to say, Ms. Delgado told the police that Lala was the shooter. [*Id.* at 153-54.] Ms. Delgado then drove [Appellant] to New York to get him out of town. [*Id.* at 155.] During the drive[,] [Appellant] told her that he was scared[,] [he] thought the victim was going to pull something[,] and [the victim] was bigger than [Appellant]. [*Id.* at 157.]

In June of 2013, Ms. Delgado spoke to Detective Rush after she had been stabbed ten times by friends of [Appellant]. [*Id.* at 158-69.] At this time[,] Ms. Delgado began giving more

information to the police. [***Id.*** at 159.] The District Attorney's Office dismissed a pending DUI [charge] against Ms. Delgado and gave her immunity for her role in the homicide. [***Id.*** at 160-62.] Ms. Delgado testified to this information before the Grand Jury.

Trial Court Opinion, filed 12/28/16, at 1-8.

Following the jury's verdict, on February 12, 2016, the trial court sentenced Appellant to a term of life imprisonment without parole. On that same date, Appellant was given his post-sentence and appellate rights. ***See*** Post Sentencing Colloquy, filed 2/12/16. On February 17, 2016, Appellant filed a timely, counseled post-sentence motion[1] in which he presented numerous claims, and on February 18, 2016, the trial court ordered that the necessary notes of testimony be transcribed.

On March 21, 2016, Appellant filed a counseled motion averring that, despite having ordered the necessary transcripts, he had not yet received the transcripts, and therefore, under Pa.R.Crim.P. 720(B)(3)(b), he sought a thirty-day extension of time in which to supplement his post-sentence motion. By order entered on that same day, the trial court granted Appellant's request, indicating that, pursuant to Pa.R.Crim.P. 720(B)(3)(a), a thirty-day extension would be added to the 120-day decision period. Thus, the post-sentence

---

[1] The record contains a copy of Appellant's motion, which is labeled an "Omnibus Post-Sentence Motion Pursuant to Rule 720(B)[.]" We note the certified docket entries mistakenly indicate that, on February 17, 2016, Appellant filed an "Omnibus Pre-Trial Motion."

motion decision period was extended to July 18, 2016.[2]  ***See*** Pa.R.Crim.P. 720(B)(3)(a), (b).

On June 24, 2016, prior to the expiration of the extended period, the Clerk of Courts purported to deny Appellant's post-sentence motion by operation of law.  On June 27, 2016, Appellant received the requested transcripts and, on June 29, 2016, having received the Clerk of Court's notice, Appellant filed a motion requesting permission to file a supplemental post-sentence motion *nunc pro tunc*.  Therein, Appellant averred that he had recently received the necessary transcripts, and he believed that he had or should have had additional time to file a supplemental post-sentence motion pursuant to the trial court's previous order.

By order entered on June 29, 2016, the trial court granted Appellant's request to file a supplemental post-sentence *nunc pro tunc* and directed Appellant to file his supplemental post-sentence motion within seven days of the order (by July 6, 2016).  On June 30, 2016, the trial court additionally directed Appellant to file a brief addressing his post-sentence motions within twenty days of the date of the order.

On July 6, 2016, Appellant filed a supplemental post-sentence motion *nunc pro tunc* raising additional claims.  On October 3, 2016, Appellant filed a

---

[2] The 150th day fell on Saturday, July 16, 2016, and thus, the post-sentence motion decision period was extended to Monday, July 18, 2016.  ***See*** 1 Pa.C.S.A. § 1908 ("**Computation of time**").

brief in support of his motion, as well as a motion for the trial court to accept the brief late. By order entered on December 28, 2016, the trial court entered an order denying Appellant's post-sentence motion. This counseled appeal followed on January 5, 2017. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, Appellant timely complied, and the trial court filed a responsive Pa.R.A.P. 1925(a) opinion.

On appeal, Appellant presents the following issues, which we set forth verbatim:

I. Did the trial court erroneously deny Appellant's motion for a new trial where the verdict was so contrary to the weight of the evidence as to make the awarding of a new trial imperative?

II. Did the trial court erroneously deny Appellant's request for access to identifying and contact information regarding over 50 eyewitnesses interviewed by the police, where the alternative approach adopted by the trial court virtually guaranteed that none of these witnesses would discuss their information with the defense and where withholding this information denied Appellant his constitutional right to prepare and present a defense?

III. Did the trial court erroneously permit a prosecution witness to testify that she was stabbed by "acquaintances of the defendant" and that acquaintances of the defendant killed her friend, where no evidence indicated that Appellant had any involvement in these alleged attacks or that he was acquainted with the attackers?

IV. Did the trial court erroneously permit a detective to provide hearsay testimony to the effect that (1) Appellant's girlfriend and her mother would not corroborate Appellant's claim that Appellant was at his girlfriend's home at the time of the incident, and (2) that an alternative suspect denied Appellant's claim that Appellant had given his cell phone to the alternative suspect immediately prior to the incident?

V. Did the trial court erroneously deny Appellant's request to inform the jury of the penalty for first degree murder in Pennsylvania, where that information was probative of the alternat[e] suspects' reasons for either refusing to testify or denying any participation in the shooting?

VI. Did the trial court erroneously impose a sentence of life imprisonment without the possibility of parole upon an 18 year old defendant, in violation of the Eighth Amendment and **Miller v. Alabama**, 567 U.S. 460 [ ] (2012)?

Appellant's Brief at 6-7.

As a preliminary matter, we consider whether Appellant filed his notice of appeal in a timely manner. "In cases where no post-sentence motions...are filed, a defendant must file an appeal within 30 days of imposition of sentence[.] If a defendant files a timely post-sentence motion, the appeal period does not begin to run until the motion is decided." **Commonwealth v. Capaldi**, 112 A.3d 1242, 1244 (citations omitted).

Under Pa.R.Crim.P. 720(A), a post-sentence motion is timely if it is filed no later than ten days after the imposition of sentence. Pa.R.Crim.P. 720 sets forth the procedure to be followed when a timely post-sentence motion is filed. Under this Rule, the trial court must decide the post-sentence motion within 120 days of the filing of the motion. Pa.R.Crim.P. 720(B)(3)(a). The trial court may grant one 30-day extension for a maximum of 150 days. Pa.R.Crim.P. 720(B)(3)(b). If the trial court fails to decide the post-sentence motion within this time period, it is deemed denied by operation of law. **Id.** When a post-sentence motion is denied by operation of law, the Clerk of Courts is directed to enter an order on behalf of the court and "furnish a copy

of the order...to...the defendant(s) and defense counsel...." Pa.R.Crim.P. 720(B)(3)(d).

In the case *sub judice*, Appellant filed a timely post-sentence motion on February 17, 2016. Furthermore, prior to the expiration of the 120-day period, since the necessary notes of testimony had not yet been transcribed, Appellant filed a motion on March 21, 2016, seeking a 30-day extension with regard to his post-sentence motions. The trial court granted Appellant's extension request, thus indicating a 30-day extension would be added to the 120-day decision period. Accordingly, at this point, the trial court had 150 days from February 17, 2016 (or until July 18, 2016) to rule on Appellant's post-sentence motion.

However, prior to the expiration of the 150-day mark, the Clerk of Courts prematurely deemed Appellant's post-sentence motion to be denied by operation of law on June 24, 2016, which was 128 days after Appellant filed his post-sentence motion. Since the Clerk of Court's denial of the post-sentence motion was in contravention of the court-approved extension, we deem the Clerk of Court's action to be a "breakdown in the system." **See Commonwealth v. Perry**, 820 A.2d 734 (Pa.Super. 2003) (holding that, where the Clerk of Courts does not follow the Rules of Criminal Procedure, such constitutes a breakdown in the lower court's processes).

This breakdown by the Clerk of Courts led to Appellant filing another motion seeking an extension of time in which to file a supplemental post-

- 10 -

sentence motion, and the trial court directed Appellant to file his supplemental post-sentence motion by July 6, 2016. Thereafter, on July 6, 2016, Appellant filed a supplemental post-sentence motion; however, the trial court did not rule on the motion by July 18, 2016 (150 days after the filing of Appellant's original post-sentence motion). Moreover, the Clerk of Courts did not provide proper notice after the 150-day mark indicating that the post-sentence motion was denied by operation of law. Rather, on December 28, 2016, the trial court entered an order denying Appellant's post-sentence motion, and within thirty days thereof, on January 5, 2017, Appellant filed a notice of appeal.

Under these circumstances, we are constrained to find that Appellant's facially untimely appeal was caused, at least in part, by a breakdown of the processes of the court below, and thus, we decline to quash this appeal on the basis it was untimely filed. *See Commonwealth v. Khalil*, 806 A.2d 415 (Pa.Super. 2002) (declining to quash appeal that was facially untimely due to breakdown in the court's system). Accordingly, we will address the issues presented by Appellant.

In his first issue, Appellant contends the jury's verdict is against the weight of the evidence.[3] Specifically, Appellant contends that the jury's verdict is unreliable since it is based upon the testimony of a single

---

[3] Appellant adequately preserved his weight of the evidence claim in his post-sentence motion and court-ordered Pa.R.A.P. 1925(b) statement. *See* Pa.R.Crim.P. 607; Pa.R.A.P. 1925

- 11 -

eyewitness, Mike King, and, thus, "[t]his mater belongs to a troubling subset of criminal cases that continues to confound the criminal justice system: the one-witness ID case." Appellant's Brief at 28. Further, Appellant contends Mr. King's identification of Appellant as the shooter at trial was inherently unreliable since Mr. King failed to identify Appellant as the shooter on the night of the crime and in his initial testimony before the Grand Jury.

Additionally, he contends that the testimony presented at trial from Mr. King and Jennifer Delgado was untrustworthy given the fact that both witnesses sought leniency and/or feared perjury charges if they did not testify favorably for the Commonwealth. He further contends that, since there were over 50 people in the bar at the time of the shooting, and thus, there existed several alternate suspects, the jury's verdict concluding that Appellant was the shooter "shock's one's sense of justice." Finally, he contends that the verdict is against the weight of the evidence since the Commonwealth's "DNA evidence showed only that [Appellant] at one point held [a] phone and [a] bag containing drugs." Appellant's Brief at 33.

The Supreme Court has set forth the following standard of review for weight of the evidence claims:

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>
> * * *
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion

of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

\* \* \*

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Clay*, 619 Pa. 423, 64 A.3d 1049, 1054-55 (2013) (quotation marks, quotations, and citations omitted). In order for an appellant to prevail on a challenge to the weight of the evidence, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa.Super. 2003) (quotation marks and quotations omitted).

Initially, with regard to Appellant's broad assertion that a jury's verdict of guilt, which is based upon the testimony of a single eyewitness, is inherently suspicious or unreliable, we disagree. Rather, as with all testimony and evidence offered at trial, in passing upon the credibility of a single eyewitness, the jury is free to believe all, part, or none of the witness's testimony. *Commonwealth v. Lambert*, 795 A.2d 1010, 1014 (Pa.Super. 2002) (*en banc*). Further, contrary to Appellant's assertion, in the case *sub judice*, the jury was presented with direct and circumstantial evidence of Appellant's guilt

beyond that presented by Mr. King, *i.e.*, Ms. Delgado's testimony and DNA evidence left at the scene.

With regard to Mr. King's reluctance in identifying Appellant as the shooter, Mr. King admitted on direct-examination that he did not inform the police that he observed Appellant shoot the victim because he does not like to cooperate with the police, he thought Appellant was otherwise "a good kid," and he was worried about retaliation. N.T., 2/3/16, at 29-30. Mr. King also admitted at trial that he initially lied to the Grand Jury about the identity of the shooter; however, he indicated that, when he testified the second time before the Grand Jury, he decided to tell the truth and identify Appellant. *Id.* at 40-41. Mr. King explained at trial that he decided to tell the truth because he had just found out that he was going to be a father and he did not want to risk going to jail for perjury. *Id.* at 41. We find the trial court did not abuse its discretion in concluding that, while Mr. King's identity of Appellant as the shooter was not entirely consistent throughout his interaction with the police and presentation of Grand Jury testimony, the "jury was in the best position to view the demeanor of [Mr. King] and [ ] assess [his] credibility." Trial Court Opinion, filed 12/28/16, at 12 (citation omitted).

With regard to Appellant's assertion that Mr. King's and Ms. Delgado's trial testimony was untrustworthy since both witnesses sought leniency and/or feared perjury charges if they did not testify favorably for the Commonwealth, the jury was made aware of each witness's criminal history, the

Commonwealth's promises of leniency, and the witness's fear of perjury. *See* N.T., 2/3/16, at 31-32, 41 (Mr. King admitted he had pending criminal charges but that the Commonwealth had not made any promises to him in exchange for his testimony, and he explained his fear of being charged with perjury); *Id.* at 186-90 (Ms. Delgado admitted that, in exchange for her trial testimony, her DUI charge was withdrawn by the Commonwealth, she was given immunity for her part in transporting Appellant to New York after the murder, and she was hoping to gain leniency with regard to a pending theft charge, although the Commonwealth had not made any promises to her with regard to the theft charge). Appellant, in essence, asks us to reweigh the testimony in his favor. However, we find no abuse of discretion in the trial court's conclusion that the weight to be given to Mr. King's and Ms. Delgado's testimony, and the consideration of their motives to lie, was a matter of credibility rightfully left to the jury. *See* Trial Court Opinion, filed 12/28/16, at 12.

With regard to Appellant's claim that the jury's verdict is against the weight of the evidence since there were over 50 people in the bar at the time of the shooting, and thus, there existed several alternate suspects, we conclude the jury was free to weigh and consider this fact in rendering its verdict. Contrary to Appellant's assertion, the fact Appellant chose to commit the murder in "a loud nuisance bar, filled with drug buyers and sellers" does not require a finding that no reliable, credible eyewitness was available. *See*

- 15 -

Appellant's brief at 33. Here, the jury clearly chose to believe Mr. King's testimony that he observed Appellant shoot the victim, as well the Commonwealth's DNA evidence and other circumstantial evidence of guilt.

With regard to Appellant's final specific weight claim, Appellant suggests the jury's verdict is against the weight of the evidence since there is an absence of corroborating DNA evidence. He suggests the "DNA evidence showed only that [Appellant] at one point held [a] phone and [a] bag containing drugs." Appellant's Brief at 33. As with the testimonial evidence presented at trial, the jury was free to weigh the significance of the DNA evidence. An appellate court cannot substitute its judgment for that of the finder of fact, and we find no abuse of discretion in the trial court's rejection of Appellant's weight of the evidence claim. **See Clay**, **supra**.

In his second issue, Appellant contends the trial court erred in denying his request for access to information identifying over 50 witnesses, who were interviewed by the police. Appellant admits that the Commonwealth provided him with the names of the witnesses, but he contends the trial court erred in failing to direct the Commonwealth to also provide "addresses or any other information which would [have] enable[d] the defense to contact and interview these people." Appellant's Brief at 37.

Moreover, while Appellant admits the trial court attempted to accommodate Appellant by gathering all of the witnesses in open court to be interviewed at a pretrial hearing, Appellant contends the trial court's approach

was inadequate since it "virtually assured that everyone would adhere to the 'street's rule' of silence and that no one would speak [in public] to the defense." Appellant's Brief at 41. Appellant avers the Commonwealth's withholding of the witnesses' contact information prevented his investigators from speaking to the witnesses in private, and thus, denied him the constitutional right to prepare and present a defense. He also suggests the trial court abused its discretion under Pa.R.Crim.P. 573 by failing to require the Commonwealth to reveal the addresses and other contact information of the eyewitnesses.

Initially, we note that our standard of review of claims that a trial court erred in its disposition of a request for the disclosure of an eyewitness's address and other contact information is confined to an abuse of discretion. *See Commonwealth v. Washington*, 63 A.3d 797, 801 (Pa.Super. 2013).

Pa.R.Crim.P. 573 provides, in relevant part, the following:

> In all court cases, except as otherwise provided in Rules 230 (Disclosure of Testimony Before Investigating Grand Jury) and 556.10 (Secrecy; Disclosure), if the defendant files a motion for pretrial discovery, the court may order the Commonwealth to allow the defendant's attorney to inspect upon a showing that they are material to the preparation of the defense, and that the request is reasonable:
>
> (i)        the names and addresses of eyewitnesses[.]

Pa.R.Crim.P. 573(B)(2)(i).

> If materiality and reasonableness are proven [by the defendant], then the courts must balance the public interest in the police's ability to obtain information against the defendant's right to prepare his defense. In this connection, we consider the crime, the potential defense, and the significance of the [witness's]

- 17 -

testimony....Furthermore, the safety of the [witness] can be a controlling factor in determining whether to reveal a [witness's] identity.

**Commonwealth v. Jordan**, 125 A.3d 55, 63 (Pa.Super. 2015) (*en banc*).

In the case *sub judice*, in addressing Appellant's issue, the trial court indicated the following in its opinion:

> [Appellant] filed a motion for supplemental discovery as part of his Omnibus Pretrial Motion. [Appellant] avow[ed] that the discovery provided by the Commonwealth in this case [was] incomplete particularly with respect to the disclosure of the identity of the Commonwealth's witnesses. Specifically, [Appellant] petition[ed] th[e] [trial] court to direct the Commonwealth to disclose "the names, addresses, and phone numbers of the witnesses interviewed by the Easton Police Department" in preparation of his defense.
>
> It is unquestioned that the United States Constitution assures the right of an accused to be provided with an adequate opportunity to present his version of the incident to the trier of fact. **Washington v. Texas**, 388 U.S. 14, 18 S.Ct. 1920 (1967). With respect to the discovery of eyewitnesses,...there is no requirement that identifying information of eyewitnesses be disclosed by the Commonwealth under the mandatory disclosure provisions of Rule 573. **See** Pa.R.Crim.P. 573; **Commonwealth v. Hood**, 872 A.2d 175 (Pa.Super. 2005). However, th[e] [trial] court may exercise [its] discretion and direct the Commonwealth to provide such information if [the court] deem[s] it material to the preparation of [a defendant's] defense.
>
> [The trial court's] review of the record indicates that the Commonwealth, through informal discovery,...provided [Appellant] with a police report which include[d] the names of approximately fifty-six (56) witnesses or individuals who[] provided statements to the Easton Police Department in this case. The Commonwealth, in the interest of public safety[,]...provided only the witnesses' names to [Appellant] and...removed their addresses and other contact information. At the time of the omnibus pretrial hearing, the Commonwealth stated that it "has concerns about the safety of the witnesses and that is not generalized. We have concerns." **See** N.T., 6/77/15, at 13. The Commonwealth further recounted for [the trial] court how the

witnesses in this homicide case "fear for their safety." *Id.* at 15. Specifically, "that a witness, Jennifer Delgado, was stabbed in an assault or stabbed by a known associate of [Appellant], that's Carl Willbright[,] in large part as she was cooperating with the police in this homicide." *Id.* at 13-14. In addition, "[Appellant] had a preliminary hearing scheduled...in an unrelated attempted homicide case," and "there were associates of [Appellant] in court" and "outside the courthouse in three strategic places." *Id.* at 14. "The victim of that attempted homicide, [Eric Edwards]," "did not show up because he feared for his and his family's safety." *Id.* Under [these] circumstances, [the trial court agreed] with the Commonwealth's position that, in the interests of the witnesses' safety[,] [ ] their addresses and other contact information, including telephone number[,] [should] not be disclosed to [Appellant].

However, [the trial court] firmly believe[d] that counsel for [Appellant] should have access to the Commonwealth witnesses to present an effective defense. [The trial court] recognize[d] that [Appellant] [was] charged with homicide and that counsel should have the ability to conduct an investigation into the incident which led to the charges. [Appellant was] provided with the names of all witnesses interviewed. [The trial court] was "concerned about access to [defense counsel]" and, as such, [the trial court] directed the Commonwealth to "make the witnesses available to [defense counsel] and/or his investigator."

***

As such, [the trial court] stated on the record...that the Commonwealth [was] directed to make th[e] "eyewitnesses available for [defense counsel] for interviews." *Id.* at 18.....[The trial court indicated that, if] some witnesses were reluctant to be interviewed by defense counsel for safety concerns, [the trial court] would direct the Commonwealth to provide a brief summary of that witness's statement to defense counsel. The Commonwealth indicated its agreement with this procedure [while defense counsel argued the trial court's solution had a "coercive effect" and would not yield the same information as was provided in the police reports.]

On September 10, 2015, [the trial court] held a hearing[4] as discussed [*supra*]. All investigative resources—possible

---

[4] We note that this Court has not been provided with a transcript pertaining to the September 10, 2015, hearing.

witnesses—were subpoenaed by the Commonwealth to show up for the hearing, and [Appellant] and defense counsel were able to ask each witness that showed up if they would like to give their information and speak with defense counsel privately about the incident. Several witnesses [ ] indicate[d] a willingness to speak to counsel, many did not. With respect to the discovery of potential witnesses, as outlined [above], there is no requirement that identifying information of potential witnesses be disclosed to the Commonwealth under the mandatory disclosure provisions of Rule 572. *See* Pa.R.Crim.P. 573; [*Hood*, *supra*.] Therefore, the Commonwealth [was] not required to disclose the identifying information of the witnesses, and the [trial court] provided [Appellant] with the ability to speak with the witnesses in a safe environment for all....Therefore, this argument is not grounds for a new trial[.]

Trial Court Opinion, filed 12/28/16, at 17-19 (citations to record omitted) (footnotes added).

We agree with the trial court's well-reasoned analysis and find no abuse of discretion. *See Washington*, *supra*. Specifically, in ruling the Commonwealth was not required to disclose the addresses and other contact information of the witnesses, we agree with the trial court's conclusion that the safety of the eyewitnesses weighed against providing the information to Appellant. Moreover, we note that, with regard to the trial court's approach of requiring the witnesses to appear in court so that defense counsel would have access to the witnesses, Appellant speculates that the approach was "doomed to fail" because the people who patronize Eddie G's are the type of people who "play by the street's rules of keeping their mouths shut." *See* Appellant's Brief at 38-39. Such speculation, however, does not persuade us

that the trial court abused its discretion. *See Washington*, *supra*. Thus, we find no relief is due on this issue.

In his third issue, Appellant contends the trial court erred in permitting Jennifer Delgado to testify at trial that "acquaintances" of Appellant stabbed her ten times five months after the shooting, as well as killed one of her friends in New York. Appellant contends Ms. Delgado's testimony constituted evidence of Appellant's "prior bad acts" and was improper since there was no foundation for the assertion that Appellant was acquainted with the culprits. In its Rule 1925(a) opinion, the trial court suggests Appellant's issue is waived for appellate review since he failed to lodge an objection to Ms. Delgado's testimony or otherwise present the issue to the trial court prior to the filing of his Rule 1925(b) statement. We agree.

The record reveals the following relevant exchange between Ms. Delgado and the prosecutor on direct-examination at trial:

> **Q:** Eventually, Ms. Delgado, you came and spoke to Detective Rush about the shootings?
> **A:** Correct.
> **Q:** Now, I think that might have been around June of 2013, does that sound right?
> **A:** Yeah.
>
> ***
>
> **Q:** And were you willing to speak with him then?
> **A:** I was hesitant.
> **Q:** Did [the detective] keep at it?
> **A:** Yes.
> **Q:** Were you assaulted in June?

**A:** I was stabbed 10 times.

**Q:** Who stabbed you?

**A:** Acquaintances of Dolo's.[5]

**Q:** Do you know did City have anything to do with the stabbing?

**A:** Of course he had something to do with it.

\*\*\*

**Q:** But after that, did you start opening up even more about what you had observed?

**A:** Yes, because then they killed my friend Chi-Chi, so I wasn't like—it was just like, when is enough.

**Q:** And that was in New York?

**A:** Yeah.

**Q:** But you're not saying Dolo did that?

**A:** No. No. I'm saying his acquaintances did that, just like his acquaintances did that to me.

N.T., 2/3/16, at 158-61 (footnote added).

Our Pennsylvania Rules of Appellate Procedure and our case law provide the well-established requirements for preserving a claim for appellate review. It is axiomatic that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). "The absence of a contemporaneous objection below constitutes a waiver" of the claim on appeal. *Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 423 (2008); *Tindall v. Friedman*, 970 A.2d 1159, 1174 (Pa.Super. 2009) ("On appeal, we will not consider assignments of error that were not brought to the

_____

[5] Testimony at trial revealed that Appellant's nickname was "Dolo."

tribunal's attention at a time at which the error could have been corrected or the alleged prejudice could have been mitigated.") (citation omitted)).

In the case *sub judice*, during trial, Appellant did not lodge an objection to the portions of Ms. Delgado's testimony that he now challenges on appeal. Accordingly, we agree with the trial court that Appellant has waived his issue on appeal.[6] ***See id.***

In his fourth issue, citing to the notes of testimony from February 4, 2016, at pages 75, 80, and 98, Appellant contends the trial court erred in permitting Detective Rush to provide hearsay testimony to the effect that (1) Appellant's girlfriend would not corroborate Appellant's statement that he was at his girlfriend's home at the time of the shooting, (2) Devol James denied having Appellant's cell phone in his possession at the time of the shooting, (3) the rumor on the street was that Appellant had something to do with the shooting, and (4) Appellant's girlfriend did not inform the police that Appellant was with her at the time of the shooting. In its Rule 1925(a) opinion, the trial court suggests Appellant's issue is waived for appellate review since he failed to lodge an objection to the testimony or otherwise present the issue to the trial court prior to the filing of his Rule 1925(b) statement. We agree.

---

[6] Although Appellant included this issue in his Pa.R.A.P.1925(b) statement, such inclusion does not "resurrect" a waived claim. ***Steiner v. Markel***, 600 Pa. 515, 968 A.2d 1253 (2009).

- 23 -

Initially, we note that in his fourth issue Appellant has mischaracterized the record. Contrary to Appellant's argument, the statements which Appellant is now challenging on appeal were not statements made by Detective Rush. Rather, at trial, the Commonwealth read into evidence excerpts from Appellant's testimony before the grand jury. The statements, which Appellant contends were hearsay statements made by Detective Rush, were actually questions posed by the prosecutor to Appellant during the grand jury proceedings, which were then read to the jury at trial by the prosecutor.[7] ***See*** N.T., 2/4/16, at 53-108.

In any event, the transcript reveals that Appellant neither objected to the specific statements at trial nor objected to the prosecutor reading to the jury the portion of the grand jury transcript now at issue. In fact, the record reveals that, during the jury trial, the prosecutor indicated he was reading Appellant's testimony from the grand jury hearing "by agreement." ***See id.*** at 53. Also, defense counsel specifically acknowledged that the prosecutor was reading to the jury Appellant's answers, as well as the prosecutor's questions, from the grand jury proceedings, and he had "no objection to that, because I don't think it hurt[s] our case." ***Id.*** at 108. Accordingly, we agree

---

[7] In reading the relevant portion of Appellant's grand jury testimony to the jury at trial, the prosecutor "played the role of himself in the reading" and "Detective Frank Jordan....play[ed] the role of [Appellant] for the reading[.]" N.T. 2/4/16, at 53.

with the trial court that Appellant has waived his fourth issue for review.[8] ***See*** Pa.R.A.P. 302(a); ***Powell***, ***supra***.

In his fifth issue, Appellant contends the trial court erred in denying his request to charge the jury regarding the penalty for first degree murder.[9] Specifically, Appellant contends that, since the defense presented evidence of two alternate suspects (Jaquan Frazier and Devol James), the jury should have been instructed regarding the "magnitude of the penalty" that Mr. Frazier and Mr. James faced so that the jury was "able to assess fully the alternat[e] suspects' motivation to deny responsibility."[10] Appellant's Brief at 56.

Initially, we note the following:

> [W]hen evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing

---

[8] As indicated *supra*, Appellant's inclusion of this claim in his Rule 1925(b) statement did not "resurrect" the waived claim. ***Steiner***, ***supra***.

[9] We note that, as one of his proposed points for charge, Appellant requested the jury be instructed as to the mandatory penalty for first degree murder. N.T., 2/4/16, at 117. Further, following the trial court's instruction to the jury, Appellant specifically objected to the omission of his proposed point from the instruction. ***Id.*** at 158.

[10] Mr. Frazier testified on direct-examination at trial that he did not see who shot the victim, and he specifically denied that he shot the victim. N.T., 2/3/16, at 106, 109. On cross-examination, defense counsel asked Mr. Frazier if he would ever "admit to shooting and killing someone in open court in front of a jury[.]" ***Id.*** at 109. Mr. Frazier indicated, "No, I wouldn't." ***Id.*** The parties stipulated that, if Devol James were to testify, he would have invoked his Fifth Amendment privilege. N.T., 2/4/16, at 157.

its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

*Commonwealth v. Antidormi*, 84 A.3d 736, 754 (Pa.Super. 2014) (quotation and citation omitted).

Here, we conclude the trial court did not err in denying Appellant's request for a jury instruction as to the punishment for first degree murder. This Court has held that "[t]he jury's function is to determine guilt or innocence." *Commonwealth v. Carbaugh*, 620 A.2d 1169, 1171 (Pa.Super. 1993) (citation omitted). "[P]unishment is a matter solely for the court and not for the jury to know or consider in its deliberations." *Commonwealth v. Golinsky*, 626 A.2d 1224, 1231 (Pa.Super. 1993) (citations, quotation marks, and quotations omitted). Accordingly, the length of punishment Appellant, or any other person convicted of first degree murder could receive, was not a proper scope of inquiry for the jury, whose function was to act as factfinder and, from those facts, determine guilt or innocence.[11] *Commonwealth v.*

---

[11] Moreover, even if properly within the scope of the jury's inquiry, we are not persuaded by Appellant's argument that his proposed instruction would have more fully assessed the alternate suspects' motivation in denying responsibility, and thus, Appellant would have benefited from the instruction. In making its credibility determinations, the jury was free to surmise that a suspect may lie about his involvement in a shooting simply because he would not want to face the criminal charges associated therewith. Also, as the trial court concluded, the potential influence to the jury by way of the jury correlating this information regarding the potential penalties with the charges Appellant was facing outweighed any potential benefit to Appellant.

***White***, 504 A.2d 930 (Pa.Super. 1986). Thus, the trial court did not err in denying Appellant's proposed jury instruction.

In his sixth issue, Appellant contends the trial court erroneously imposed a sentence of life imprisonment without the possibility of parole upon him in violation of the Eighth Amendment and ***Miller v. Alabama***, 567 U.S. 460 (2012).

Appellant presents a legality of sentencing claim.

> It is [ ] well-established that [i]f no statutory authorization exists for a particular sentence, that sentence is illegal and subject to correction. An illegal sentence must be vacated. Issues relating to the legality of a sentence are questions of law[.]…Our standard of review over such questions is *de novo* and our scope of review is plenary.

***Commonwealth v. Cardwell***, 105 A.3d 748, 750 (Pa. Super. 2014) (citations and quotations omitted).

On June 25, 2012, the United States Supreme Court held in ***Miller v. Alabama*** that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" 567 U.S. 460, 132 S.Ct. 2455, 2460. However, while the Supreme Court's holding in ***Miller*** set forth a bright-line rule that mandatory sentences of life imprisonment without the possibility of parole are unconstitutional for juvenile offenders, it did not prevent a trial court from

imposing such a sentence upon an individual such as Appellant, who had already reached the age of eighteen at the time he committed the murder.[12]

Appellant acknowledges that he was eighteen years old at the time he committed the murder; however, he argues, nevertheless, that he may invoke *Miller* because his immature and/or impulsive brain made him similar to a juvenile. Thus, Appellant seeks an extension of *Miller* to persons convicted of murder who were older at the time of their crimes than the class of defendants subject to the *Miller* holding. However, this Court has previously rejected such an argument. *See Commonwealth v. Furgess*, 149 A.3d 90 (Pa.Super. 2016) (holding the nineteen-year-old appellant was not entitled to relief under *Miller*; rejecting argument that he should be considered a "technical juvenile"). Accordingly, we conclude Appellant's issue is meritless.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/15/2017

---

[12] Appellant was born on May 25, 1994, and he committed the instant murder on February 9, 2013.

- 28 -